# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| TOM DEFOE, a minor by and through his parent and guardian, PHIL DEFOE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.:  3:06-CV-450 (VARLAN/SHIRLEY) |
| SID SPIVA, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This civil action is before the Court on the Plaintiffs' Motion and Memorandum in Support of Motion to Reconsider Plaintiffs' Motion for Summary Judgment [Doc. 340] and defendants' request for judgment as a matter of law contained within Defendants' Post-trial Memorandum of Facts and Law [Doc. 341].  The Court has reviewed all relevant filings, including the transcripts of the trial of this matter [Docs.336; 337; 338], and for the reasons stated herein, defendants' request for judgment as a matter of law will be granted and Plaintiffs' Motion and Memorandum in Support of Motion to Reconsider Plaintiffs' Motion for Summary Judgment [Doc. 340] will be denied.

## I.     Relevant Background[1]

Plaintiff Tom Defoe was a high school student who attended Anderson County High School ("ACHS") and Anderson County Career and Technical Center ("ACCTC") until at least December 20, 2007. All Anderson County schools have a dress code policy in effect which states in part:

> Apparel or appearance, which tends to draw attentions to an individual rather than to a learning situation, must be avoided.
>
> ***
>
> Clothing and accessories such as backpacks, patches, jewelry, and notebooks must not display (1) racial or ethnic slurs/symbols, (2) gang affiliations, (3) vulgar, subversive, or sexually suggestive language or images; nor, should they promote products which students may not legally buy; such as alcohol, tobacco, and illegal drugs.

[Doc. 341.]

On October 30, 2006, Tom Defoe wore a t-shirt to school bearing the image of the Confederate flag. School officials informed Tom Defoe that his shirt violated the school's dress code policy, and he was asked to remove the shirt or turn it inside out. Tom Defoe refused to comply and was sent home. On November 6, 2006, Tom Defoe wore a belt buckle depicting the Confederate flag to school. Again, a school official informed Tom Defoe that his clothing violated the dress code policy and when Tom Defoe refused to comply with the dress code, he was suspended for insubordination. Prior to these two instances, Tom Defoe

---

[1]Because of the extensive history of this case, only the relevant facts and background are included in this discussion. Because much of the Court's analysis focuses on whether defendants reasonably forecasted a material and substantial disruption, the facts discussed here focus on the testimony related to this issue.

2

wore clothing depicting the confederate battle flag to school on several occasions but complied with requests to remove or cover the clothing.

Plaintiffs sued defendants claiming that Tom Defoe's constitutional rights were violated by the schools' ban on displays of the Confederate flag. The case proceeded to trial but ended in a mistrial after the jury was unable to reach an unanimous verdict.

At trial, Tom Defoe testified that he wore depictions of the Confederate flag to display his pride for his southern heritage. Trial Tr. vol. 2, 49-50, 69, Aug, 12, 2008. He stated that his father told him about his ancestors and his heritage and that the flag represents part of who he is. *Id.* at 50. He also testified that he did not believe his displays of the Confederate flag would cause any disruption at the school if there was no rule against such displays. *Id.* at 62.

Greg Deal, principal of ACHS, testified at trial that there had been some racially motivated incidents and interactions before the 2006-2007 school year that caused him to be concerned about students displaying the Confederate flag. *Id.* at 104. He further stated that he believed that a disruption or interference with the learning environment would likely occur if the ban was lifted tomorrow. *Id.* at 148. However, he admitted that he previously stated in a deposition that he would not expect a disruption to occur in the school at that time because of the Confederate flag's presence. *Id.* at 104; 148. He clarified at trial that he meant that he did not think a display of the flag would cause fight or a riot because there was only one African-American student and he could not do much on his own, but that student may have felt threatened or intimidated. *Id.* at 105-06. Specifically, he stated,

3

I think that if a student comes into your school, a minority student comes into your school, and he walks down a hallway and there's a group of young men standing there with rebel flags on their t-shirts, and they call him the 'n' word or they tell him, 'get your ass out of our hallway,' that's a disruption. That has happened.

*Id.* at 106.

He also described an incident when students used the Confederate flag to intimidate others. *Id.* at 108. He stated that two days after two African-American young men enrolled in the school, he found a big Confederate flag hanging in the hallway of the school. *Id.* He testified that when he went to take it down, there was a group of "good ol' boys" laughing and snickering. *Id.* at 109. From the circumstances, Mr. Deal stated that he concluded the flag was hung to send the message that the African-American men were not welcome at the school. *Id.*

Additionally, Mr. Deal stated that he has observed racism both in the community and at the school, including people telling him that they are lucky not to have any black people at ACHS. *Id.* at 118. He stated that he went into the 2005-2006 school year anticipating trouble because of his experience in the community and the fact that he had an African-American student enrolling. *Id.* at 119.

Mr. Deal described an incident that occurred at a basketball game in January 2005 between ACHS and Clinton High School. During the warm-up, Oreo cookies were thrown onto the court from the ACHS student section. *Id.* at 123. During his investigation of the incident, students told Mr. Deal that they had thrown the cookies on the floor because a player from Clinton High School was bi-racial. *Id.* at 124. The Clinton High School

4

student's father wrote a letter to the editor that was printed in the Clinton Courier stating that the ACHS students were racist and the school administration needed to do something about it. *Id.*

Mr. Deal recalled an incident that occurred in September 2003 when some Hispanic students were harassed by self-proclaimed "rednecks" on the basis of their race. *Id.* at 124-26. Mr. Deal stated that the Hispanic students came in to talk to him and reported "the rednecks are harassing us. When we walk by they called us dirty niggers, sand niggers and dirty Mexicans and said you need to leave, get out of our school." *Id.* at 126. The Hispanic students complained that some of the harassing students were wearing shirts with an image of the Confederate flag. When Mr. Deal went to investigate, the group referred to as the rednecks denied the name calling, but those wearing Confederate flag shirts agreed to turn them inside out. *Id.*

Mr. Deal described a situation in which an African-American student from Clinton High School attended at Leadership class at ACHS and was called a "nigger" by several white students. *Id.* at 130-31. He investigated the situation but was unable to identify the responsible students. *Id.* at 131-32.

Mr. Deal stated that he has observed several instances of racially charged graffiti at ACHS. *Id.* at 132-142. He described graffiti in the auditorium as being a swastika with "the 'F' bomb, 'hell yeah,' 'niggers,' [and] 'white power'" written near it. *Id.* at 133. On the football bleachers, he discovered graffiti reading, "White 4 Life" and "I Hate Niggas, J/K AVM." *Id.* at 135-40. He indicated that he understood J/K to mean "joking" and AVM to

5

mean "Andersonville Mafia," a name used by a group of students who are "gangsters." *Id.* at 140-41. Additionally he observed the name of an African-American young man and the name of girl he dated along with "something about nigger-lover, white girl, black boy" and a drawing of a hangman's noose by the pole vaulting pit at the school. *Id.* at 142-43.

Mr. Deal stated he never saw a student wear a shirt with a picture of Malcolm X, Martin Luther King, or a black fist on it. *Id.* at 147. He stated that one of those displays would likely cause a reprisal and that if he saw a shirt with Malcolm X on it, he would ban it. *Id.*

Mr. Deal testified that when he started as assistant principal in 1998, he did not like the Confederate flag ban in the dress code because he did not understand the need for it. *Id.* at 127. However, after witnessing different events at the school, his feelings about the policy changed and now he agrees with it. *Id.* at 127-28.

Sidney Spiva, former principal at ACCTC, stated that the Confederate flag ban is intended to avoid offending certain students. Trial Tr. vol. 1, 135, Aug. 11, 2008. He stated that he believed that there could be a conflict if Tom Defoe approached certain students who did not share his viewpoint on the Confederate flag while displaying the flag on his clothing. *Id.* at 123. Mr. Spiva testified that he believes that a disruption or interference in the learning environment would occur if the ban were lifted. *Id.* at 146-47. However, Mr. Spiva also stated that he would enforce the ban even if he knew the particular display was not going to cause any disruption. *Id.* at 122; 135-36.

6

Mr. Spiva testified that a student wore a "very racially charged" and "offensive" shirt to school one day and he asked the student to remove it before classes started and the student complied. *Id.* at 128-29; 139-40. He stated that had the student not have removed the shirt, the school would have received complaints about it from minorities and from the general school population. *Id.* at 140. He stated that the shirt would have "most definitely" caused a disruption or interfered with the learning environment at the school. *Id.* at 146.

Mr. Spiva testified that he would not allow a student to wear a t-shirt with a black fist on it but he would allow an image of Martin Luther King to be displayed if he did not have any basis for thinking it would cause a problem. *Id.* at 132-33. However, he had never seen either of the images displayed on a shirt at his school. *Id.* at 146.

Merl Krull, former assistant principal at ACCTC, testified that the Confederate flag is banned because it offends some people and "[i]t interferes with the educational process." Trial Tr., vol. 2, 14, Aug. 12, 2008. Mr. Krull reported that Tom Defoe's displays of the Confederate flag caused disruptions in the form of discussions about the flag between students in the hallway between classes. *Id.* at 9, 14. He also stated that he believed that there would be more incidents with students getting into arguments about the Confederate flag if the ban was lifted. *Id.* at 14. However, Mr. Krull testified that he would enforce the ban even if he knew the flag would not cause a disruption at the school. *Id.* at 14; *see also id.* 8.

Mr. Krull cited one specific occasion when a teacher brought one of his students to Mr. Krull's office because she was very upset about something that happened in the

7

classroom and wanted to call home. *Id.* at 12. Mr. Krull determined that the student had been called some racist and inappropriate names in reference to her Caucasian mother and African-American father. *Id.* at 12.

John Burrell, chairman of the Anderson County School Board, stated that the Board decided to ban anything that they felt would be disruptive to students in the school systems and they determined that the Confederate flag fell within that category. Trial Tr. vol. 1, 33-34, Aug. 11, 2008. He stated that the School Board would not consider lifting the ban as long as the flag was disruptive to any group of students in the system, but if it was not disruptive, he would not oppose displays of the Confederate flag. *Id.* at 39.

He testified that even if the principal from ACHS reported that a display of the Confederate flag was not likely to cause a disruption in his school, he would still ban it because it was a system-wide ban. *Id.* at 40. However, he then stated that he did think the ban was necessary at ACHS because there have been "enough racial incidences there to warrant it." *Id.* at 45. He cited the incidents involving the display of the Confederate flag in the hallway immediately after the enrollment of two African-American students and the basketball game when Oreo cookies were thrown on the floor. *Id.* at 45-46.

Dr. Burrell specifically stated, "I would be against removing the ban as long as we have a racially mixed group [of students] with some of those students who I think it would be offensive to." *Id.* at 48-49. He testified that after a student was offended, "the next step is a fight, a riot, that type of situation. We want a safe environment for our school for our

8

students to be educated." *Id.* at 63-64. He testified that if a child was sitting in class and something is offensive to him, that could impact his learning. *Id.* at 64.

V.L. Stonecipher, Director of Schools for the Anderson County School Board, stated that it is the school board's interpretation of the code of conduct that the Confederate flag is banned in all Anderson County Schools. *Id.* at 68. He stated that he did not recall a discussion by the school board regarding a ban of the Confederate flag, but said that instead, "we've always looked at things as to whether or not they are going to be a distraction, whether it's going to be dangerous or whether it's going to create a dangerous disagreement." *Id.* at 71.

He stated that he would have enforced the ban even if the principal told him that the flag was unlikely to cause a disruption in a particular school. *Id.* at 83. He testified that he could not confirm that there were some schools in the county where the Confederate flag would not cause a disruption. *Id.* at 81-82. He stated that preventing some students from being offended justified the ban. *Id.* at 83.

Mr. Stonecipher testified that displays of the Confederate flag would be a distraction to any student who was offended by it and could escalate to some type of conflict or violence. *Id.* at 99. He went on to testify,

> Once a student's offended, sometimes they can become irrational, and when you have those disagreements occurring they can be dangerous disagreements. When those – when you have what I consider to be dangerous disagreements, there's, most of the time, there's going to be some type of conflict or violence.

*Id.* at 99. He stated that during his forty-three years in the Anderson County School System, he experienced several instances of racial hatred. *Id.* at 96-97.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* To defeat a motion for summary judgment, the opposing party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury

question, and not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson*, 477 U.S. at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. Analysis

### A. Procedural Errors

Before reaching the merits of the pending motions, the Court will address plaintiffs' argument that defendants should not be granted any relief due to procedural errors with defendants' request for judgment as a matter of law. [*See* Doc. 345.] Plaintiffs argue that the Court does not have authority to grant the relief requested in Defendants' Post-Trial Memorandum of Facts and Law [Doc. 341] because it was not styled as a motion and that, if it is an extension of defendants' motion for directed verdict made during trial, it is untimely.

The Court notes the somewhat unusual procedural posture of this case. After multiple motions for summary judgment and motions for a preliminary injunction were filed and denied, this case went to trial. After three days of trial and two days of jury deliberation, the foreperson informed the Court that the jury was unable to reach a unanimous decision and a mistrial was declared. After the mistrial, the Court held a status conference and ordered that the parties shall have thirty days after receipt of the trial transcript to file any motions. Within the thirty day period, plaintiffs filed a motion for summary judgment and a motion

11

for a preliminary injunction, and defendants filed a post-trial memorandum arguing that defendants are entitled to judgment as a matter of law.

Although plaintiffs are correct that defendants did not style their post-trial memorandum as a motion and that a renewed motion under Federal Rule of Civil Procedure would be untimely, the Court does not agree that it does not have the authority to grant the relief requested in Defendants' Post-Trial Memorandum of Facts and Law [Doc. 341]. A district court may grant summary judgment *sua sponte* when the party adversely affected is put on notice to produce evidence establishing a genuine issue of material fact. *See Brown v. Raymond Corp.*, 432 F.3d 640, 649 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 326). The Court recalls stating at the status conference that it was allowing the parties the opportunity to brief the Court on their positions in light of the trial testimony and the recently decided opinion in *Barr v. Lafon*, 538 F.3d 554, 562 (6th Cir. 2008). The Court stated that it was aware of the parties' positions and, therefore, they were not required to file responses to their opponents' briefs. Accordingly, plaintiffs were put on notice that their opportunity to argue for judgment in their favor and against judgment in favor of the defendants was in their filing within the thirty-day period. Plaintiffs were put on notice of defendants' position through defendants' prior motions for summary judgment, their arguments at trial, and their post-trial memorandum [Doc. 341]. Thus, even if the defendants did not properly move for summary judgment as plaintiffs contend, the Court could still *sua sponte* grant summary judgment in defendants' favor.

Additionally, the Court considers it a mere technicality that defendants did not style their post-trial memorandum as a motion and failure to consider defendants' request for judgment as a matter of law on the merits would be unjust. *See* Fed. R. Civ. P. 1 ("These rules . . . should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). Accordingly, the Court will consider Defendants' Post-Trial Memorandum of Facts and Law [Doc. 341] as a request for judgment as a matter of law.

### B.    Free Speech

Plaintiffs argue that defendants failed to produce evidence to support a finding of a reasonable forecast of a material and substantial disruption to the school environment. Defendants argue that the evidence on the record clearly supports the ban of potentially racially divisive symbols, including the Confederate flag.

"[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). While students do not "shed their constitutional rights to the freedom of speech or expression at the schoolhouse gate," students' rights to free speech are limited due to the special characteristics of the school environment. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988); *Barr v. Lafon*, 538 F.3d 554, 562 (6th Cir. 2008). Students' right to free speech must be balanced against the need for school officials "to

13

maintain the discipline and learning environment necessary to accomplish the school's educational mission." *See Barr*, 538 F.3d at 562.

In light of these considerations, *Tinker* provides that school officials may regulate student speech which causes a material and substantial disruption to the learning environment. *Tinker*, 393 U.S. at 509; *see also Barr*, 538 F.3d at 564 ("*Tinker* governs the instant case because, by wearing clothing depicting images of the Confederate flag, students engage in pure speech not sponsored by the school."). *Tinker* does not require certainty that a disruption will occur, only a reasonable forecast of a substantial disruption. *Barr*, 538 F.3d at 565; *Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir. 2007). Therefore, it is not necessary for the Confederate flag to have caused a disruption in the past. *Barr*, 538 F.3d at 565. Rather, regulation of displays of the Confederate flag in the school environment is permissible if "the school reasonably forecast that the Confederate flag would cause material and substantial disruption to schoolwork and school discipline." *Id.* at 565; *accord Lowery*, 497 F.3d at 592. "[A] school may reasonably forecast that the Confederate flag would cause a substantial and material disruption of a school when the school had recently experienced intense racial conflict." *Barr*, 538 F.3d at 568. However, the school cannot ban displays based upon an "undifferentiated fear or apprehension of disturbance." *Tinker*, 393 U.S. at 508; *Barr*, 538 F.3d at 567.

Defendants presented significant evidence of recent racial disruptions at ACHS and ACCTC. Defendants gave examples of disruptions and racial tension including a large Confederate flag being hung in the hallway of ACHS two days after two African-American

14

students enrolled to send a message that the African-American students were not welcome; people in the community and at the school expressing racism; Oreo cookies being thrown onto the gym floor at a basketball game because a player from the opposing team was biracial; the father of the Clinton basketball player writing a letter to the editor of the Clinton Courier stating that ACHS students were racist and the administration needed to do something about it; a report to the school principal that a group of students, some of whom were wearing t-shirts displaying the Confederate flag, were calling Hispanic students racist names; an African-American student from Clinton High School being called racist names while attending a leadership class at ACHS; racist graffiti being found around the school with content such as "white power," "White 4 Life," "I Hate Niggers, J/K AVM," and a drawing of a hangman's noose with the name of an African-American young man and a girl he dated with "something about nigger-lover, white girl, black boy;" and a teacher taking a female student out of class at ACCTC because she was being called racist names by other students and wanted to call home.

These incidents show that both ACHS and ACCTC have recently experienced intense racial conflict. In *Tinker*, the Supreme Court found that student displays of black armbands in protest of the Vietnam war did not cause a disruption to the school environment because the speech did not "intrude[] upon the work of the schools or the rights of other students." 393 U.S. at 508. A notable difference between the speech in *Tinker* and displays of the confederate flag here, is that the speech in *Tinker* communicated negative feelings toward the Vietnam war, while the speech in this case conveys a message of hatred toward some

15

students because of their race. In finding that displays of the confederate flag interfered with other students' rights, the Sixth Circuit stated, "Unlike in *Tinker*, Plaintiffs-Appellants' free-speech rights 'colli[de] with the rights of other students to be secure and let alone.'" *Barr*, 538 F.3d at 568 (quoting *Tinker*, 393 U.S. at 508). Accordingly, it was reasonable for school officials to forecast that displays of the Confederate flag would cause a material and substantial disruption.

The conclusion the Court reaches here is supported by the Sixth Circuit's recent holding in *Barr*. In *Barr*, several students who attended William Blount High School sued various school officials alleging that the defendants' dress code prohibition of clothing depicting the Confederate flag violated their rights to free speech and equal protection. 538 F.3d 554. The defendants presented evidence of prior racial disruptions at William Blount High School similar to that present in the case here. This included evidence of a physical altercation between an African-American and a white student at a basketball game on February 22, 2005, which resulted in the parent of the African-American student filing a complaint with the Office of Civil Rights at the Department of Education alleging that the school punished the African-American student more harshly than the white student; racist graffiti containing racial slurs and "hit lists" of students' names; a parental complaint that his daughter was called racially derogatory names, threatened because of her race, and taunted by the Confederate flag; an increase in absenteeism among African-American students out of fear of racial violence; and a school lockdown in April 2005, the purpose of which was to be proactive and show that the school was safe and secure. *Id.* at 557-59, 566.

16

Additionally, some of the student plaintiffs admitted that racial tensions were high at the school. *Id.* at 558, 566. The Sixth Circuit held that based upon these events "the school reasonably forecast that clothing bearing images of the Confederate flag would disrupt schoolwork and school discipline." *Id.* at 567.

One fact plaintiffs cite in support of their position that there was no reasonable forecast of a material and substantial disruption is that Mr. Krull, Mr. Spiva, Mr. Deal, and Mr. Stonecipher all testified that they would enforce the ban even if they did not believe that a particular display would cause a disruption. However, the fact that several school officials testified that they would ban displays of the flag even if they did not feel it would cause a disruption does not change the result as that is a hypothetical situation not now before the Court. In fact, a school official made a similar statement in *Barr* that he would still ban displays of the flag even if displays of the flag did not cause a disruption, yet the regulation was upheld. *See id.* at 560.

In light of the factually similar *Barr* opinion and other controlling precedent, the Court concludes that it was reasonable for school officials to forecast that displays of the Confederate flag would cause a material and substantial disruption to the school environment. Accordingly, it was constitutional for school officials to restrict displays of the Confederate flag at ACHS and ACCTC.

### C. Viewpoint Discrimination

Plaintiffs contend that even if regulation of racially divisive speech is permissible, the prohibition of displays of the Confederate flag at issue here is impermissible because it

constitutes viewpoint discrimination. Defendants argue that there are no facts in the record that show viewpoint discrimination.

Even when a school is permitted to ban a certain expression because the school reasonably forecasts that the expression will cause a substantial disruption of school activities, the ban must be viewpoint neutral. *See id.* at 571; *Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 543-44 (6th Cir. 2001). Viewpoint discrimination occurs when there is "a ban on the use of racial slurs by one group of speakers but not those speakers opponents." *Barr*, 538 F.3d at 572 (internal quotations omitted). Thus, if both proponents of racial tolerance and proponents of racial discrimination are forbidden to display the Confederate flag, there is no viewpoint discrimination. *See id.* at 572. In *Barr*, the court affirmed summary judgment on the issue of viewpoint discrimination for school officials stating, "there is no evidence that the ban on disruptive symbols would not have been applied equally to a student displaying a Confederate flag in solidarity with hate groups, and another who displayed a Confederate flag in a circle with a line drawn through it." *Id.* at 572.

The same is true here as there is no evidence that any displays of the Confederate flag are permitted at ACHS or ACCTC. In fact, the ban of Tom Defoe's displays of the Confederate flag support this idea because his displays were prohibited despite that fact that he stated that his reason for displaying it was to show his pride for his southern heritage and not to convey a message of racial hatred.

Plaintiffs also complain that the school should not be able to teach diversity but ban racially divisive symbols. However, this argument has no support in the law. "[A]lthough

18

the restriction on racially intolerant but not racially tolerant messages may be unconstitutional as applied to adults acting in a public forum, the same is not true in the public schools." *Id.* at 573 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-94 (1992)). The *Barr* court recognized that "courts accord more weight in the school setting to the educational authority of the school in attending to all students' psychological and developmental needs." 538 F.3d at 567-68. The court explained,

> "Public education must prepare pupils for citizenship in the Republic.... It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." *Fraser*, 478 U.S. at 681, 106 S.Ct. 3159 (quoting C. Beard & M. Beard, New Basic History of The United States 228 (1968)). Given the extensive Supreme Court precedent affirming the unique mission of public education and holding that the free-speech rights of public-school students are not coextensive with those of adults, we believe that the exclusion of racially divisive symbols in a school that has experienced intense racial tensions is a permissible content-based restriction. The critical question, therefore, is whether the school has enforced its facially neutral, written dress code banning racially divisive symbols in a viewpoint-discriminatory manner.

*Id.* at 573. Thus, it is permissible for schools to teach racial and cultural diversity and equality but to ban displays of the Confederate flag.

Having lost their other arguments in support of viewpoint discrimination, plaintiffs now argue that the ban of the Confederate flag is unconstitutional because many of the defendants testified that their motive in banning displays of the Confederate flag was to keep other students from being offended. However, a determination that the Confederate flag is offensive does not negate a reasonable belief that it would cause a material and substantial disruption to the school environment. *Id.* at 567. To the contrary, the fact that it causes

19

offense to some students may support a reasonable forecast of a disruption. *Id.* While school officials are not justified in banning student speech merely because other students may be offended, if there is evidence to show that the offense could lead to a disruption, regulation is permissible. *See id.* at 567-68. In *Barr*, the Sixth Circuit found that, despite school officials stating that they found that displays of the Confederate flag were offensive, the "ban [of] the Confederate flag is constitutional because of the disruptive potential of the flag in a school where racial tension is high and serious racially motivated incidents, such as physical altercations or threats of violence, have occurred." *Id.* at 568.

School officials have not banned displays of the Confederate flag at ACHS and ACCTC merely because they believe that such displays are offensive but rather because they believe that the offense caused by it could lead to a material and substantial disruption. In addressing the reason for the ban, Mr. Krull stated that the flag is banned because it offends some people and "interferes with the educational process." Trial Tr. vol. 2, 14, Aug. 12, 2008. Similarly, Dr. Burrell stated that the school board banned displays of the flag because the board decided to ban anything that would cause a disruption to the school environment. Trial Tr. vol. 1, 33-34, Aug. 11, 2008. He testified that after a student was offended, "the next step is a fight, a riot, that type of situation. We want a safe environment for our school for our students to be educated." *Id.* at 63-64. Mr. Stonecipher testified that displays of the Confederate flag would be a distraction to any student who was offended by it and could escalate into a conflict or violence. *Id.* at 99.

Because the Court finds that school officials banned all displays of the Confederate flag, regardless of the viewpoint expressed by those displaying it, and it is not banned merely because it is offensive, the Court finds that the defendants did not engage in viewpoint discrimination.

### D.      Tailoring of the Regulation

Plaintiffs argue that the regulation of displays of the Confederate flag was not properly tailored.  Arguing that the First Amendment requires narrow tailoring, plaintiffs state that school officials were required to make individualized findings that a specific display would cause a disruption rather than apply a countywide ban.  However, this is not what is required in the school environment.  As *Barr* explains,

> [If] the evidence on the record establishes that the school enforces the dress code in a viewpoint-neutral manner to ban those racially divisive symbols that the school reasonably forecasts will substantially and materially disrupt schoolwork and school discipline[,] the dress code's ban on racially divisive symbols is narrowly tailored to the state and the school's substantial interest in educating students.

583 F.3d at 576.  Because the Court has found here that the undisputed evidence shows that school officials reasonably forecasted a material and substantial disruption to the school environment by displays of the Confederate flag, and they banned such displays in a viewpoint-neutral manner, the regulation of plaintiffs' speech in this case is properly narrowly tailored.

# IV. Conclusion

For the reasons discussed herein, on the undisputed facts, defendants are entitled to judgment as a matter of law. Accordingly, defendants' request for judgment as a matter of law [*see* Doc. 341] will be **GRANTED**, Plaintiffs' Motion and Memorandum in Support of Motion to Reconsider Plaintiffs' Motion for Summary Judgment [Doc. 340] will be **DENIED**, and this case will be **DISMISSED**.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE